GOSLEE v. SHUTE. See Case No. 8,958.

GOSLER (UNION BANK OF GEORGETOWN v.). See Case No. 14,358.

GOSS (BUCKNAM v.). See Case No. 2,097.

GOSS & P. MANUF'G CO. v. GERHARD. See Case No. 5,843.

GOSSLER (DELAWARE MUT. SAFETY INS. CO. v.). See Case No. 3,766.

━━━━━

## Case No. 5,631.

### GOSSLER et al. v. GOODRICH.

[3 Cliff. 71.] [1]

Circuit Court, D. Massachusetts. May Term, 1867.

CUSTOMS DUTIES—REPEAL—ASSESSMENT—"BOUND TO THE UNITED STATES."

1. Where an act specified that certain duties and rates of duty should be imposed upon certain imports in lieu of the duties heretofore imposed. *Held*, that the language was tantamount to a repeal of the prior rates of duty.

[Cited in Washington Mills v. Russell, Case No. 17,247.]

2. A person purchased certain sugars in a foreign port, and expressed an intention of shipping them to the United States, and the charter-party was for a voyage to a certain foreign port for a cargo, thence to New York or Boston as ordered. Before the ship sailed from the port at which she was lying, a stipulation was added to the charter-party, giving the charterers the option of sending the vessel to Falmouth for orders to discharge at one of the several enumerated foreign ports. Before the departure of the ship, the purchaser notified the parties through whom the purchase was made, that the vessel would not go to America. The bill of lading and all the papers were made out to send the vessel to Falmouth for orders, and the goods were consigned to Hamburg. When the ship arrived at Falmouth the purchaser then ordered her to proceed to Boston, where she arrived January 22, 1862. Duties upon the cargo were assessed and collected according to the act of December 24, 1861. *Held*, that such assessment was correct.

This was an action of assumpsit [by John H. Gossler and others] against the defendant [John C. Goodrich], the collector of the port of Boston, to recover the sum of $29,112.04, part of the sum of $40,350.70 paid, under protest, as duties upon a cargo of white and brown sugars, and was presented to the court upon facts agreed. The goods were imported in the ship Southern Cross. Markwald & Co. purchased the sugars under the directions of one Henry Devens, agent of the plaintiffs, and also a general agent of Gossler & Co., of Hamburg, of which firm two mem-

1 [Reported by William Henry Clifford, Esq., and here reprinted by permission.]

bers were also members of the firm of Gossler & Co., of Boston. When the ship was chartered she was lying at Macao, and the charter-party was for a voyage to Bangkok for a cargo, thence to proceed to New York or Boston, as ordered, for the sum of $13,500 in American currency. Before the ship sailed, however, from the port where she was lying, an additional stipulation was, at the request of Devens, appended to the charter-party, giving the charterers the option to send the vessel to Falmouth for orders, to discharge at London, Hamburg, or Bremen. In such case the freight was to be £3,750, and the stipulation was, that orders should be given before the departure of the vessel from Bangkok. Before the departure of the ship, Devens decided that the cargo should be sent to Falmouth for orders, and caused Markwald to be notified that the vessel would not go to America, but to Europe. Pursuant to his direction, the bill of lading, and all the papers were made out to send the vessel to Falmouth for orders, and the goods were consigned to Berenberg, Gossler & Co., Hamburg. It was agreed that the vessel accordingly proceeded to Bangkok, was there loaded, and then sailed for Falmouth, under the provision appended to the charter-party giving the charterer that option. When she arrived there she was ordered by Devens, who had previously reached London, to proceed to Boston, where she arrived January 22, 1862, and on the 25th of the same month her cargo was entered for warehousing on behalf of the plaintiffs. The plaintiffs contended that section 5, c. 68, Acts 1861 (12 Stat. 179), was operative in reference to the sugars; that the sugars were actually on shipboard and bound to the United States on the 5th of August, 1861, and therefore were liable to a duty of three fourths of a cent per pound, under section 5 (P), c. 68, Act 1861 (12 Stat. 179).

C. L. Woodbury and M. E. Ingalls, for plaintiff.

The goods were bound to the United States. What is the meaning of "bound to the United States," as used in the act of congress of 1861? Does it mean that these goods upon the 5th of August, 1861, were on their way to the United States, and in the most direct course between Bangkok and this country? Not by any means. It means simply this: that these sugars upon that day were intended for the markets of the United States, no matter when or by what route they were to be brought here. And all the plaintiffs have got to do is to furnish proof of that fact, such as would be sufficient to satisfy a jury of twelve men. Were these sugars, then, upon the 5th of August, 1861, intended for the markets of the United States? It is apparent from the facts, that on the 5th of August, 1861, these sugars in question, on board the Southern Cross, were intended for the United States market. That this intention was

liable to be defeated by certain contingencies has no weight, because those contingencies did not take place, and the sugars did arrive here. Then arises the further question, whether the fact that these sugars were imported by the way of Falmouth, not the most direct course, can have any influence? Gant v. Peaslee [Case No. 5,212]; Millar v. Millar [Id. 9,546]; Grinnell v. Lawrence [Id. 5,831]; Wilbur v. Lawrence [Id. 17,635]. Again, if these sugars were not intended for the United States market, on the 5th of August, when was such intention formed? For the sugars are here, and they could not have come here, unless brought here intentionally by the importers. Was this intention formed at Falmouth? Then these sugars were imported from England, and the collector should have ascertained their value in the principal markets of that country. That he did not do this, when the facts were fresh in his mind, and all the parties to the transaction before him, is convincing proof that he did not believe at that time the theory which has since been devised in this case. The facts are in favor of the plaintiff upon this second proposition, and likewise the equities of the case. The fifth section of the act of congress of August 5, 1861, was not repealed upon the 3d of May, 1862, but was in full force and effect. It is not repealed by this statute by express words. Is it repealed by implication? Repeals of statutes by implication are not favored, unless there is a positive repugnancy between the two acts. The question to be considered then is this: Is there so clear a repugnancy between the act of congress of December, 1861, and the 5th section of the act of August, 1861, that the earlier statute must give way to the latter? There is no repugnancy whatever, when we look at the intention of congress and the spirit of their legislation. In 1861, congress made a radical change in the spirit of its legislation as to the collection of duties on imports. Previous to that time congress had made the arrival of goods the date upon which new duties should attach. That is, if a new duty act happened to be passed upon the 20th of March, then all goods which arrived after the 19th of March were subject to the new duties. By this rule goods became subject to new rates of duties, not when the importation commenced, nor when it ended, but in the midst of the act. In 1861, congress fixed the period of importation to be from the time when the goods were put on shipboard in the foreign country, until the duties were paid at the custom-house, and they also established the rule that legislation as to duties, whether increasing or decreasing them, should not operate upon goods in process of importation, unless it was so declared in specific words. The first act of congress which inaugurates this policy is that of March 2, 1861. The real preamble to this act is in the fifth section, which is also the enacting clause for that tariff. It is in these words: "There

shall be levied, etc., on goods, wares, and merchandise, herein enumerated and provided for, imported from foreign countries, the following rates and duties."

The meaning of the words "imported from foreign countries" is given in the thirty-third section, and is there defined to mean goods whose importation had not commenced by going on ship-board. By saying in the thirty-third section that that act should not apply to goods on shipboard or in warehouse, they say that the words of the enacting clause should be like this: upon goods as to which the act of importation has not commenced by going on shipboard, the following duties shall be levied, etc. The same language is used in the act of August 5, 1861. That this was the intention of congress is further seen by the joint resolution of January 11, 1862. The act of December 24, 1861, increased the duties upon tea, coffee, and sugar. The treasury department construed it to impose the new duties upon goods in warehouse, and the attention of congress was called to this construction, and they passed the joint resolution referred to, expressly negativing the idea that they intended these new duties to apply to goods in process of importation. By examining the act of July 14, 1862 [1 Stat. 543], we shall find further and stronger proof of this intention. In the twenty-first section they expressly repeal a portion of the fifth section of the act of August, 1861, thus showing that they did not consider it repealed. The language in the first part of the section is very significant with reference to the matter under discussion. It is in these words: "Goods which shall remain in the public stores or bonded warehouse for more than three months from the date of original importation, if withdrawn for consumption, and all goods on shipboard on the first day of August, shall be subject to the duties prescribed by this act." By the first section the act is to take effect on the 1st of August. Now if no change in legislation had been made by congress up to that time, why specify that goods on shipboard on the 1st of August should be subject to the duties imposed by that act? This would follow as of course if the old system of legislation was in force. It must be clear to every mind that why congress particularly specified goods upon shipboard in this section was because they thought the exigencies of the government needed these duties, and they could not be collected unless mentioned.

G. S. Hilliard and W. A. Field, for defendant.

The date of the arrival of merchandise within the port of entry and discharge is the date of importation, and chapter second of the act of congress of 1861 (12 Stat. 330), took effect on December 24, 1861, the day of its passage; and all sugars arriving at a port of entry and discharge within the United States from a foreign port, on and after December 24,

1861, were subject to the duties expressed in said act, which are the duties actually levied. U. S. v. Arnold [Case No. 14,469]; Id. 9 Cranch [13 U. S.] 104; U. S. v. Vowell, 5 Cranch [9 U. S.] 368. The only provisions of law relating to the duties on sugars, intervening between the acts of the 5th of August, 1861, and the 24th of December, 1861, are contained in section 1, c. 45, Acts 1861 (12 Stat. 292). Section 33, c. 68, Acts 1861 (12 Stat. 199), is in many respects similar to section 5, c. 45, Acts 1861 (12 Stat.), and the two are exceptional provisions in the statutes relating to customs. · The phraseology in chapter 2, Acts 1861, to wit, "that from and after the date of the passage of this act, in lieu of the duties heretofore imposed by law, on articles hereinafter mentioned, there shall be levied, collected, and paid, on the goods, wares, and merchandise herein enumerated and provided for, imported from foreign countries, the following duties and rates, that is to say," is substantially the same phraseology used in all acts relating to customs duties, passed since the establishment of the government, some acts going into effect on the day of passage, and others on a day named in the act. Section 1, Act 1789, (1 Stat. 24); section 1, Act 1790 (1 Stat. 24); section 1, Act 1791 (1 Stat. 199); section 1, Act 1792 (1 Stat. 259); section 1, Act 1794 (1 Stat. 390); Act 1795 (1 Stat. 411); section 1, Act 1797 (1 Stat. 503); section 1, Act 1800 (2 Stat. 84); section 2, Act 1804 (2 Stat. 299); Act 1812 (2 Stat. 768); section 1, Act 1816 (3 Stat. 310); section 1, Act 1824 (4 Stat. 25); section 1, Act 1828 (4 Stat. 270); section 2, Act 1832 (4 Stat. 583); Act 1841 (5 Stat. 463); sections 1, 2, et seq. Act 1842 (5 Stat. 549); sections 1, 2, et seq. Act 1846 (9 Stat. 42); section 1, Act 1857 (11 Stat. 192); Act 1861 (12 Stat. 178, §§ 5–25, 33); Resolution No. 15, § 2 (12 Stat. 252); Act 1861 (12 Stat. 292, c. 45, §§ 1, 5) the act being an act to provide increased revenue; Act of 1863 (12 Stat. 742); section 1 et seq. Act 1864 (13 Stat. 202); section 2 et seq. Act 1865 (13 Stat. 493); Act 1866 (14 Stat. 8); section 1, Act 1866 (14 Stat. 328); Act 1867 (14 Stat. 559).

It thus appears that the time of arrival of goods within a port of entry and discharge is the date of importation, and the duties established by law at the time of such arrival are the duties imposed on such goods; that congress has not in general regarded the time of exportation in levying duties, and that section 33 of the act of March 2, 1861, and section 5, act of August 5, 1861, are exceptional in reference to regarding the time when goods were put on shipboard, and bound to the United States, as the time at which duties accrue; that in reference to tea, coffee, and sugar that exceptional policy was abandoned by the act of December 24, 1861 (chapter 2, Act 1861); and in reference to all goods by the act of July 14, 1862, c. 163, § 21. Chapter 2, 1861, is entitled "An act to increase the duties on tea, coffee, and sugar." Sections 33 and 35, ubi supra, do not purport to give a statutory definition of the word "imported" in the revenue sense; the language is not "that goods, wares, and merchandise shall be held to be imported when they are actually on shipboard and bound to the United States." These sections leave the meaning of the phraseology—"there shall be levied, collected, and paid on goods, wares, and merchandise imported into the United States, the following duties, that is to say"— unaltered, and that meaning was established and well known. These sections are exceptions in terms from the legal operation of such a phraseology. Chapter 2, 1861, ubi supra, does not in terms impose additional duties, but duties in lieu of duties, and contains no exceptions, and establishes a duty of two and a half and three cents on all brown and white sugars imported on and after December 24, 1861. But even if the law were as the plaintiffs contend, the facts do not bring this case within the language of the said section five. The goods were not bound to the United States, and this fact alone is decisive. The sugars were consigned to J. Berenberg, Gossler & Co., of Hamburg, and not to persons within the United States. Until after the order was given that the Southern Cross should proceed to Boston, these sugars were as truly bound to London, Hamburg, or Bremen, as to Boston or New York. These facts in this case are distinguished from Gant v. Peaslee [Case No. 5,212]; Millar v. Millar [Id. 9,546]; Warren v. Peaslee [Id. 17,198]; Grinnell v. Lawrence [Id. 5,831]; Griswold v. Maxwell [Id. 5,838]. See Sampson v. Peaslee, 20 How. [61 U. S.] 571; Irvine v. Redfield, 23 How. [64 U. S.] 170. The construction that a vessel must be actually bound, in the sense of actually proceeding to the United States, gives force to all the words of the clause of section 5, and seems analogous to the construction put upon other clauses of the statutes relating to customs.

CLIFFORD, Circuit Justice. Raw sugar, called "muscovado," and brown sugar, not advanced beyond the raw state, under the act of the 2d of March, 1861, was subject to a duty of three fourths of one cent per pound. Refined sugars were subject to two cents per pound, whether loaf, lump, crushed, or pulverized. 12 Stat. 479. All goods, wares, and merchandise, under the act of the 5th of August, 1861, entitled "An act to provide increased revenue from imports," which were actually on shipboard and bound to the United States, were subject to pay only such duties as were provided by law before, and at the time of the passage of that act. 12 Stat. 293. Rates of duty on sugars were increased by the act of the 24th of December, 1861; and the parties agree that the rates of duty assessed and collected in this case, are those expressed in that act, which went into effect at the date of its passage. The language of the provision is, "that from and after the date

of the passage of this act, in lieu of the duties heretofore imposed by law, on articles hereinafter mentioned, there shall be levied, collected, and paid on the goods, wares, and merchandise herein enumerated and provided for, imported from foreign countries, the following duties and rates of duty, that is to say," tea, coffee, and sugars, as therein classified and provided.

Observe that these "duties and rates of duty" are imposed in lieu of the duties heretofore imposed by law on the articles therein mentioned. Direct repeal would be no stronger, as it is expressly enacted that the increased duties and rates of duty shall be imposed in lieu of the duties heretofore imposed by law. Terms more explicit and comprehensive could not be employed, and the provision neither contains any exception, nor admits of any, without the necessity of resorting to positive legislation. 

Goods actually on shipboard, and bound to the United States at the date of the prior act, were specially exempted from its operation, and were only required to pay such duties as were previously provided by law; but the act of the 24th of December, 1861, under which the duties in this case were assessed and collected, contains no such exception, and there is nothing in any other act of congress which affords any support to the theory of the plaintiffs.

Reference is made to the joint resolution of the 11th of January, 1862, as affording support to that theory, but it is clear that it cannot be construed to have any such effect, as it is expressly limited to goods warehoused at the date of the passage of the act, entitled "An act to increase the duties on tea, coffee, and sugar." Viewed as a provision for one class of goods only, and that a different one from the importation in this case, the argument from it is rather against the theory of the plaintiffs than in their favor. "Expressio unius est exclusio alterius."

Suppose it were otherwise, however, and that it can be admitted that the provision in the prior law, exempting goods actually on shipboard, and bound to the United States at the date of the new enactment, was in full force, still we are of the opinion that the plaintiffs ought not to prevail, because it is clear, we think, that the goods constituting the importation in this case were not, on the 5th of August, 1861, bound to the United States. Plaintiffs concede that they cannot prevail, unless the agreed statement shows that the goods were actually on shipboard at that date, and bound to the United States.

Having come to the conclusion that the goods were not at that date bound to the United States, it is not necessary to decide whether, on the facts agreed, they were, or were not, actually on shipboard, and we express no opinion on that point. Undoubtedly the case shows that the person who purchased the goods expressed an intention to make the purchase, and ship the goods to the United States; but the record contains the most plenary evidence that he changed his mind, and that the goods were actually purchased, shipped, and forwarded to Falmouth, without any definite intention to import them here, and with the right expressly reserved to discharge at London, Hamburg, or Bremen. They were invoiced in the name of a foreign house, and consigned to Berenberg, Gossler & Co., of Hamburg. Bills of lading were signed by the master, wholly inconsistent with the theory of the plaintiffs, and the vessel actually cleared for Falmouth, and for orders. The shippers were bound by the charter-party to make their election before the ship sailed, and they made it as required, and gave notice in writing.

Other questions were discussed at the bar, but in the view of the case we have taken it is not necessary to examine them, as the points actually decided dispose of the controversy. The duties were correctly computed and properly collected, and according to the agreement of the parties, there must be judgment for the defendant, with costs.